953 F.2d 1137
 Nina JORDAN; Susan Bagley; Sharon Hanson; Sandra Entz;
Yvonne Wood, Plaintiffs-Appellees,
v.
Booth GARDNER; Chase Riveland; Lawrence Kincheloe; Eldon
Vail; Richard Affresio, Defendants-Appellants,
and
Washington State Corrections Employees Association,
Defendant-Intervenor.
 Nos. 90-35307, 90-35552.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 5, 1991.
Decided Jan. 10, 1992.
As Amended April 2, 1992.
 
 Therese M. Wheaton, Asst. Atty. Gen., Corrections Div., Olympia, Wash., for defendants-appellants.
 Karl Nagel, Aitchison & Hoag, Walla Walla, Wash., for defendant-intervenor.
 Timothy K. Ford, MacDonald, Hoague & Bayless, Seattle, Wash., for plaintiffs-appellees.
 Mary Megan McLemore, Preston, Thorgrimson, Shidler, Gates & Ellis, Bellevue, Wash., for plaintiff-intervenor.
 Appeal from the United States District Court for the Western District of Washington.
 Before WALLACE, Chief Judge, O'SCANNLAIN, Circuit Judge, and BURNS,* District Judge.
 WALLACE, Chief Judge:
 
 
 1
 Gardner and other officials connected with the Washington Corrections Center for Women (prison officials) appeal from the district court's order enjoining them from implementing a policy which involves routine and random cross-gender pat searches. The prison officials argue that the district court erred by holding that the searches violate inmates' first, fourth, and eighth amendment rights. The district court had jurisdiction pursuant to 28 U.S.C. § 1343. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We reverse.
 
 
 2
 * The Washington Corrections Center for Women (WCCW) is an all-female institution which houses approximately 270 convicted felons, classified at the minimum, medium, and maximum security levels. More than half of the incarcerated women are violent offenders; one out of five are in prison for murder. In addition, fifty percent of the inmates have a history of drug abuse, and twenty-five percent have an alcohol dependency. The prison is currently operating about 60% over capacity.
 
 
 3
 In January 1989, Vail took over as the new superintendent of WCCW. One of his responsibilities was to improve the security in the facility. As part of the security overhaul, Vail installed a metal detector and directed the guards to perform periodic room searches. In order to control the movement of contraband through the facility, Vail decreased the number of routine strip searches, but implemented a policy of random pat searches of the inmates. Vail required both male and female guards to perform these searches.
 
 
 4
 The pat search is conducted on fully clothed inmates, and lasts between 45 seconds and one minute. During the search, guards stand next to the inmates, and quickly run their hands over the inmates' body. Contact with the breasts and crotch is brief and restricted.[1]
 
 
 5
 On July 5, 1989, the new search policy became effective, and a handful of inmates were pat-searched by male guards. A few hours later, certain inmates filed a pro se complaint in federal court, alleging that the cross-gender searches were unconstitutional. The district judge granted the inmates' motion for a preliminary injunction, and the case was placed on an expedited trial schedule. After hearing testimony from all parties, the district judge held that the searches were constitutionally impermissible, and permanently enjoined the practice.
 
 II
 
 6
 We review the district court's findings of fact for clear error. United States v. Benny, 786 F.2d 1410, 1419 (9th Cir.), cert. denied, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986). Conclusions of law are reviewed de novo. United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). The district court's conclusion that the searches are unconstitutional is a mixed conclusion of law and fact, which we review de novo. Id. at 1201-04; Friedman v. Arizona, 912 F.2d 328, 331 (9th Cir.1990) (Friedman ), cert. denied, --- U.S. ----, 111 S.Ct. 996, 112 L.Ed.2d 1079 (1991).
 
 A.
 
 7
 In support of their claim that the searches violate their first amendment rights, two inmates testified that their religion prohibits them from being touched by men who are not their husbands. An expert witness corroborated this claim. The district judge found this testimony credible, and concluded that the searches violated at least some inmates' sincerely held religious beliefs.
 
 
 8
 A prison regulation which impinges on first amendment rights is valid if it is "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) (Turner ). Four factors are relevant in assessing the reasonableness of the regulation at issue. "First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." Id. (internal quotation omitted). Second, it should be determined "whether there are alternative means of exercising the right that remain open to prison inmates." Id. at 90, 107 S.Ct. at 2262. "A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates." Id. "Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation." Id.
 
 
 9
 In analyzing the inmates' first amendment claims, the district court held that there was a rational connection between the search policy and security interests (factor one). The court also found that altering the search policy would have an effect throughout the prison (factor three). However, the court found that there were ample alternatives to the search policy (factor four), and concluded that the prison's interest in the regulation was outweighed by the fact that the inmates had no other means of observing their religious objections to the search (factor two). Based upon these latter two determinations, the district court concluded that there had been a first amendment violation. We agree with the district court's analysis of factors one and three, but conclude that the judge erred in his analysis of search alternatives (factor four) and lack of other means of religious observation (factor two).
 
 
 10
 The inmates presented no evidence demonstrating ready alternatives to the search policy. However, they contend that they "did not have to offer possible alternatives; the evidence showed that there were real alternatives already in place." This argument misconstrues Turner. Pointing to alternatives that exist does not satisfy the inmates' burden of proving that these alternatives involve little or no cost. Id. at 90-91, 107 S.Ct. at 2262 (prisoner must "point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests"); O'Lone v. Estate of Shabazz, 482 U.S. 342, 349-50, 107 S.Ct. 2400, 2404-05, 96 L.Ed.2d 282 (1987) (O'Lone ) (reasonableness of prison regulation does not hinge on it being the least restrictive alternative).
 
 
 11
 The inmates direct us to no evidence in the record, and we have found none, which substantiates their claim that alternatives to the search policy cost the prison absolutely nothing. To the contrary, prison officials consistently testified that requiring women to perform all searches would "have adverse effects on the institution." O'Lone, 482 U.S. at 352, 107 S.Ct. at 2406. For example, Vail testified at length that a single sex search policy created a number of labor problems and conflicted with the requirements of the collective bargaining agreement. Vail also testified that requiring women to perform all searches made the pat searches more predictable and less effective for controlling the movement of contraband through the facility. Finally, Vail pointed out that pulling women off their posts to perform searches in other areas of the prison could create additional security problems in terms of leaving that post vacant, and also by creating delays in moving inmates through the facility. This testimony rebuts the inmates' arguments that alternatives to the search policy are costless. See id. at 352-53, 107 S.Ct. at 2406-07 ("concerns of prison administrators" demonstrate lack of easy alternatives to prison policy).
 
 
 12
 It may be that the inmates and the district court misapplied the burden of proof. In his oral decision, the judge stated:
 
 
 13
 I was waiting to hear [Superintendent Vail] say that these kinds of searches were necessary for the internal security of the prison, that they had to be done, that they were in some way crucial. He did not say that. He testified about a lot of things, the sum total of which I concluded to be that it would be better and easier to run the prison as it ought to be run if he could have these cross-gender pat searches.
 
 
 14
 Any such requirement that prison officials prove that the searches were "crucial" would be inconsistent with the reasonableness standard of Turner. See O'Lone, 482 U.S. at 350, 107 S.Ct. at 2405 ("the [court erred] when it established a separate burden on prison officials to prove 'that no reasonable method exists by which [prisoners'] religious rights can be accommodated without creating bona fide security problems' "). In the face of evidence that it is "better and easier" for the prison to allow the cross-gender searches, the last Turner factor weighs in favor of concluding that the searches are constitutional. See Turner, 482 U.S. at 90-91, 107 S.Ct. at 2262-63.
 
 
 15
 Turning to the district court's factor two analysis, it is true that the inmates had no alternative means of observing their religious objections to the searches. But this alone does not weigh heavily in favor of invalidating the regulation, in light of their ability to follow other tenets of their religion.
 
 
 16
 In O'Lone, the Supreme Court upheld a prison regulation that prevented inmates from attending a service that was of "central importance" to their religion. O'Lone, 482 U.S. at 351, 107 S.Ct. at 2405. Despite the lack of alternatives to attending the service, the Court held that the "ability on the part of respondents to participate in other religious observances of their faith supports the conclusion that the restrictions at issue here were reasonable." Id. at 352, 107 S.Ct. at 2406. Similarly, in this case, the inmates are not wholly deprived of the ability to practice their religion. Cf. Friedman, 912 F.2d at 332 (prison policy prohibiting inmates from complying with one tenet of religion not unconstitutional, in part because other forms of religious exercise exist).
 
 
 17
 The inmates did not carry their burden of proving costless alternatives to the prison policy. Moreover, the search policy does not deprive the inmates of the ability to "participate in other religious observances of their faith." O'Lone, 482 U.S. at 352, 107 S.Ct. at 2406. We therefore conclude that the inmates have failed to prove that the prison policy is not "reasonably related to legitimate penological interests." Turner, 482 U.S. at 89, 107 S.Ct. at 2261.
 
 B.
 
 18
 The inmates argue that the cross-gender searches are unreasonable and violate the fourth amendment. In Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (Bell ), the Supreme Court upheld the practice of routine body cavity searches of pretrial detainees. In doing so, the Court established a balancing test for evaluating searches in the prison context:
 
 
 19
 [t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.
 
 
 20
 Id. at 559, 99 S.Ct. at 1884. Following Bell, we have rejected a number of fourth amendment challenges to searches within a prison. See Thompson v. City of Los Angeles, 885 F.2d 1439, 1445-46 (9th Cir.1989) (upholding body cavity search of arrestee); Michenfelder v. Sumner, 860 F.2d 328, 332-33 (9th Cir.1988) (Michenfelder ) (visual strip searches of male inmates are not unconstitutional, even when viewed by female guards); Rickman v. Avaniti, 854 F.2d 327 (9th Cir.1988) (Rickman ) (routine visual strip searches do not violate fourth or fourteenth amendment); Grummett v. Rushen, 779 F.2d 491, 495-96 (9th Cir.1985) (Grummett ) (no constitutional violation when female guards perform routine pat searches of male inmates).
 
 
 21
 In Grummett, we rejected a constitutional challenge to a prison policy that permitted female guards to perform pat searches on clothed male inmates and occasionally view naked inmates. We pointed out that although the searches included the groin area, "[they] are done briefly and while the inmates are fully clothed, and thus do not involve intimate contact with the inmates' bodies." Id. at 496. We also observed that prohibiting the searches would "necessitate a tremendous rearrangement of work schedules, and possibly produce a risk to both internal security needs and equal employment opportunities for the female guards." Id. Finally, we rejected the argument that "otherwise 'reasonable searches' become unreasonable when conducted by a guard of the opposite sex." Id. at 495. Accord Michenfelder, 860 F.2d at 334 (rejecting similar privacy challenge because "requiring [female employees] to be replaced by males for the duration of strip searches, would displace officers throughout the prison").
 
 
 22
 We see no principled way to distinguish Grummett. Therefore, the considerations relied upon in Grummett to uphold cross-gender pat searches of male inmates lead us to conclude that the searches here are reasonable. First, the district judge found that the searches are conducted for security purposes. Second, the searches are brief in duration, and are conducted on fully clothed inmates. Third, as in Grummett, the correction officers are trained to conduct the searches in a professional manner. See Grummett, 779 F.2d at 496. Finally, requiring women to conduct all searches could displace officers throughout the prison. Thus, we conclude that the prison officials' labor and security concerns are sufficient to justify the brief invasion of privacy occasioned by the cross-gender pat searches. See id.
 
 C.
 
 23
 The district judge ruled that the pat searches constitute cruel and unusual punishment, concluding that "[t]here is a high probability of great harm ... to some inmates from these searches." We are skeptical that the record supports such a sweeping conclusion. The inmates presented trial testimony from seven expert witnesses who speculated that the searches would be psychologically damaging. However, these experts admitted uncertainty about the effect of the searches, and were largely without empirical data to substantiate their predictions. See, e.g., Reporter's Transcript 12/12/89 at 33, 59 (experts relying on single six month survey of 52 admitted inmates showing that 54% reported some type of abuse); id. at 39 (admitting that no efforts were made to verify the survey results); id. at 65 ("we don't know how many [inmates will be harmed] and we don't know who those people might be"); Reporter's Transcript 12/13/89 at 289 (expert conceding that she cannot predict how many inmates will have negative reactions). See Rhodes v. Chapman, 452 U.S. 337, 346-47, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (Rhodes ) (judgment concerning cruel and unusual punishment "should be informed by objective factors to the maximum possible extent" (citations omitted)); Soto v. Dickey, 744 F.2d 1260, 1268 (7th Cir.1984) ("Courts should proceed cautiously in making an Eighth Amendment judgment [because] ... revisions cannot be made in the light of further experience."), cert. denied, 470 U.S. 1085, 105 S.Ct. 1846, 85 L.Ed.2d 144 (1985). Furthermore, other expert witnesses testified that they believed the cross-gender searches would have no significant adverse effect on the inmates. See Reporter's Transcript 12/18/89 at 612-14 (pointing out the lack of data substantiating harm from cross-gender searches); id. at 615, 617-18 (cross-gender pat searches will not likely cause inmates to become psychotic or develop a phobia); id. at 650 (cross-gender pat searches will not likely cause post-traumatic stress disorder or other irreparable psychological harm in women inmates); see also Reporter's Transcript 12/14/89 at 471-76 (corrections officer from another facility testifying that she is aware of no problems resulting from a similar cross-gender search policy at that facility). However, we need not decide whether the judge's factual finding is clearly erroneous, because even if we assume that the inmates have proven a "probability of harm" they still have not established an eighth amendment violation. See Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir.1982) (Hoptowit ) (expert opinions do "not ordinarily establish constitutional minima").
 
 
 24
 The eighth amendment proscribes "the 'unnecessary and wanton infliction of pain,' which includes those sanctions that are 'so totally without penological justification that it results in the gratuitous infliction of suffering.' " Id., quoting Gregg v. Georgia, 428 U.S. 153, 173, 183, 96 S.Ct. 2909, 2925, 2929, 49 L.Ed.2d 859 (1976). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (Whitley ). Although it is unconstitutional to deprive inmates of "the minimal civilized measure of life's necessities," other prison conditions that are "restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society." Rhodes, 452 U.S. at 347, 101 S.Ct. at 2399; see also Whitley, 475 U.S. at 319, 106 S.Ct. at 1084 (the infliction of pain in the course of a prison security measure does not in itself demonstrate an eighth amendment violation).
 
 
 25
 We are required to give "wide-ranging deference" to "[prison officials'] adoption and execution of policies ... to preserve internal order and discipline and to maintain institutional security." Bell, 441 U.S. at 547, 99 S.Ct. at 1878. This deference "requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." Whitley, 475 U.S. at 322, 106 S.Ct. at 1085. The district judge failed to give the prison official's decision this required deference when the district judge found that the cross-gender pat searches were not necessary for internal security. Thus, we conclude that the district judge's finding was clearly erroneous. In this case, the district judge conceded that he had "no doubt" that prison officials implemented the policy to address "the legitimate governmental interest of security." In light of this finding, we cannot conclude that the searches are "so totally without penological justification that [they amount to] the gratuitous infliction of suffering." Hoptowit, 682 F.2d at 1246 (quotations omitted); see also Vigliotto v. Terry, 873 F.2d 1201, 1203 (9th Cir.1989) (eighth amendment protects prisoners from searches performed solely for "calculated harassment").[2]
 
 
 26
 Nor can the prison's implementation of the search policy be challenged successfully. Prison guards have been carefully trained to conduct the searches in the least threatening manner, and every effort has been made to mitigate the impact of the searches on the inmates. There is no evidence that the searches are performed for any illegitimate reasons. Cf. Tribble v. Gardner, 860 F.2d 321, 325 n. 6 (9th Cir.1988) (digital rectal search may violate eighth amendment if not related to any legitimate penological justification), cert. denied, 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989).
 
 
 27
 Finally, the brief pat searches do not violate "evolving standards of decency." Baumann v. Arizona Department of Corrections, 754 F.2d 841, 846 (9th Cir.1985) (Baumann ) (quotations omitted). "[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), quoting Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Thus, the Supreme Court has upheld searches much more intrusive than the one involved here. Bell, 441 U.S. at 558-60, 99 S.Ct. at 1884-85; see also Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (prisoners have no legitimate expectation of privacy in their prison cells). Given our line of cases upholding strip searches and body cavity searches in the prison context, e.g., Rickman, 854 F.2d at 328, we cannot hold that these brief, fully clothed, cross-gender pat searches "offend the standards of decency in modern society." Baumann, 754 F.2d at 846.[3]
 
 III
 
 28
 We are not unmindful that the pat searches may be uncomfortable or unpleasant for some inmates. Perhaps if we were the prison officials, we might choose another course than cross-gender searches. However, "the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution." Bell, 441 U.S. at 562, 99 S.Ct. at 1886. Because there is no constitutional violation, we are without power to interfere in these sensitive matters of prison administration. See id. The district judge's order enjoining the cross-gender pat searches and awarding attorney fees to the inmates is therefore reversed.
 
 
 29
 REVERSED.
 
 
 30
 O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:
 
 
 31
 While I concur in the court's analysis of plaintiffs' First and Fourth Amendment claims, I must respectfully dissent from its analysis and conclusions on the Eighth Amendment issue. I conclude that Judge Bryan's findings of fact were correct and were not "clearly erroneous" and with one exception, see ante at 1142, apparently the court does as well;[1] we differ in the legal conclusions flowing from such findings so far as current "cruel and unusual punishment" doctrine is concerned.
 
 
 32
 * When Superintendent Eldon Vail took over the stewardship of the Washington Corrections Center for Women ("WCCW"), he was confronted with a problem. The guards' union, the Washington State Corrections Employees Association, had filed a grievance against the institution's policy of forbidding cross-gender so-called "pat" searches of the inmates. The female guards were unhappy that their food breaks, taken while they were still officially on duty, were occasionally interrupted in order to conduct a one-minute search. Shortly after his assumption to the role of superintendent, Vail decided to deny the grievance but moot the issue by implementing random, cross-gender searches.
 
 
 33
 During the so-called "pat" search, a guard is to "[u]se a flat hand and pushing motion across the [inmate's] crotch area." Plaintiff's Exhibit No. 16, Jordan v. Gardner, No. C89-339TB (W.D.Wash.) (guard training material). The guard must "[p]ush inward and upward when searching the crotch and upper thighs of the inmate." Id. All seams in the leg and the crotch area are to be "squeez[ed] and knead[ed]." Id. Using the back of the hand, the guard also is to search the breast area in a sweeping motion, so that the breasts will be "flattened." Id. Superintendent Vail estimated that the searches take forty-five seconds to one minute.
 
 
 34
 Judge Bryan understandably refused to use the term "pat" search to describe the new policy which was instituted on July 5, 1989. Transcript of Court's Oral Decision, Dec. 22, 1989 at 18. Several inmates were searched by male guards on that first (and only) day of its implementation. One, who had a long history of sexual abuse by men, unwillingly submitted to a cross-gender search and suffered severe distress: she had to have her fingers pried loose from bars she had grabbed during the search, and she vomited after returning to her cell block.[2] Later that day, the inmates obtained a preliminary injunction, which was transformed into a permanent injunction after an expedited trial. Random cross-gender searches have not occurred at WCCW since that day, over two years ago.
 
 
 35
 The district court issued its order permanently enjoining the searches following a seven-day trial. The district court record includes over 1000 pages of trial testimony transcripts and about 300 court documents. In reaching its decision, the district court heard six days of live testimony, reviewed eight written or videotaped depositions, and received fifty-six exhibits.
 
 II
 
 36
 "After incarceration, only the 'unnecessary and wanton infliction of pain' ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Ingraham v. Wright, 430 U.S. 651, 670, 97 S.Ct. 1401, 1412, 51 L.Ed.2d 711 (1977) (quoting standard originally described in Gregg v. Georgia, 428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)) (internal citation omitted), quoted in Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). While none dispute that our inquiry should focus upon whether the search policy at issue constitutes the "unnecessary and wanton infliction of pain," there appears no consensus as to the means to determine whether the policy meets that description.
 
 
 37
 * Under traditional Eighth Amendment analysis, we consider whether there is an "infliction of pain," and, if so, whether that infliction is "unnecessary and wanton."
 
 
 38
 * The district court made a number of findings of fact on the issue of pain. Noting that many of the inmates at WCCW have suffered sexual or physical abuse by men, the district court found that physical, emotional, and psychological differences between men and women "may well cause women, and especially physically and sexually abused women, to react differently to searches of this type than would male inmates subjected to similar searches by women." Findings of Fact & Conclusions of Law at 3, Jordan v. Gardner, No. C89-339TB (W.D.Wash. Feb. 28, 1990) [hereinafter Findings & Conclusions] (p 6). The district court found that "[t]here is a high probability of great harm, including severe psychological injury and emotional pain and suffering, to some inmates from these searches, even if properly conducted." Id. (p 8). This finding was buttressed by testimony regarding the inmate witnesses' personal history, which the court found to be credible. Id. (p 7).
 
 
 39
 The record in this case, including the depositions of several inmates and the live testimony of one, describes the shocking background of verbal, physical, and, in particular, sexual abuse endured by many of the inmates at WCCW. For example, one inmate, who gave live trial testimony, described rapes by strangers (twice) and by husbands or boyfriends. She was also beaten by various men in her life; two deprived her of adequate food; one pushed her out of a moving car. Her story is not particularly unique. Eighty-five percent of the inmates report a history of such abuse to WCCW counselors, including rapes, molestations, beatings, and slavery.
 
 
 40
 Another inmate testified by deposition that her second husband beat her, strangled her, and ran over her with a truck. As she grew up, another inmate was frequently strapped or handcuffed to a bed by her half-brother, who beat or raped her; inmate's mother told her that there was nothing wrong with her half-brother's conduct. The inmate's mother once directed her to masturbate her stepfather, and in her later teens she was pushed into sexual liaisons by her mother, who would then blackmail the men. Another inmate's hand was broken by one of her two wife-beating husbands. Another inmate was sixteen when her uncle impregnated her; after the failure of the uncle's attempts to induce an abortion using a broom handle, screwdriver, bleach, and Lysol, the uncle paid a man to marry her. During that marriage, she was frequently raped by her husband and his friends, one time ending up in the hospital after they beat her and "ripped [her] behind."
 
 
 41
 The inmates presented testimony from ten expert witnesses on the psychological impact of forced submission to these searches by male guards, and related issues. The experts included WCCW staff members, social workers, psychologists, an anthropologist, and the former Director of Corrections for four different states (Raymond Procunier). The testimony described the psychological fragility and disorders found in abused women. A psychologist specializing in psychotherapy for women testified that the unwilling submission to bodily contact with the breasts and genitals by men would likely leave the inmate
 
 
 42
 "revictimiz[ed]," resulting in a number of symptoms of post-traumatic stress disorder.
 
 
 43
 Although the majority points to some expert testimony that expresses uncertainty as to the magnitude of the harm suffered by the inmates, this court is not in the position of weighing evidence in the first instance. On appeal we look for clear error. Only if we are left "with the definite and firm conviction that a mistake has been committed," McConney, 728 F.2d at 1201, may we overturn Judge Bryan's factfinding. Based on the record just summarized, Judge Bryan's findings are fully justified. And despite its discussion casting doubt on Judge Bryan's factfinding, in the final analysis the majority too is apparently unwilling to disturb the trial court's findings of fact regarding the impact of the searches on the inmates. See ante at 1142.
 
 
 44
 Although the majority states that the inmates' experts "admitted uncertainty about the effect of the searches," id. at 1142, apparently because they were unable to identify the extent of harm which would be suffered by any particular inmate or how many would suffer great harm, the inmates' experts unanimously were of the view that some would suffer substantially. Given the inmates' own testimony and the fact that many of the inmates' experts were actually employed at WCCW and familiar with the inmates, the majority's skepticism of the district court's findings is not well placed.[3]
 
 
 45
 Once the district court's findings are accepted, there is no doubt that the constitutional standard for a finding of "pain" has been established. In most other search cases, the court has not been presented with evidence pointing to more than momentary discomfort caused by the search procedures. Compare Tribble v. Gardner, 860 F.2d 321, 325 n. 6 (9th Cir.1988) (digital rectal searches may inflict pain for Eighth Amendment purposes), cert. denied, 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989) with Grummett v. Rushen, 779 F.2d 491, 493 n. 1 (9th Cir.1985) ("pat-down" searches (including groin area) of male inmates by female guards does not describe sufficient harm for Eighth Amendment protection) and Smith v. Fairman, 678 F.2d 52, 53 (7th Cir.1982) (per curiam) ("pat" searches of male inmates by female guards, during which the guards simply pat the clothing and avoid genital areas, are not sufficiently barbarous to violate the Eighth Amendment), cert. denied, 461 U.S. 907, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983). However, none of these cases presented a record of potential serious psychological harm anything like that presented by the WCCW inmates.
 
 
 46
 We have previously recognized that conditions of confinement that seriously threaten the health and safety of the inmates are unconstitutional, even if these conditions have not caused actual illness but merely pose an unreasonable risk of harm. See Hoptowit v. Spellman, 753 F.2d 779, 783-84 (9th Cir.1985). If stagnant air or poor lighting are a sufficient harm for Eighth Amendment purposes, see id., then the inmates doubtless have established sufficient harm here.
 
 2
 
 47
 Whether the infliction of pain is "unnecessary and wanton" involves an inquiry into the justification for the measure complained of and the intent behind the measure. Where "[t]here is no purpose to inflict unnecessary pain nor any unnecessary pain involved," Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 464, 67 S.Ct. 374, 376, 91 L.Ed. 422 (1947) (plurality), there is no cruelty.
 
 
 48
 In the majority's view, the inmates' Eighth Amendment claim fails on the "unnecessary and wanton" portion of the test. The majority offers the following reasoning in support of its conclusion that the prison officials have advanced a sufficient justification for the search policy:
 
 
 49
 In this case, the district judge stated that he had "no doubt" that prison officials implemented the policy to address "the legitimate governmental interest of security." In light of this finding, we cannot conclude that the searches are "so totally without penological justification that [they amount to] the gratuitous infliction of suffering." Hoptowit, 682 F.2d at 1246 (quotations omitted); see also Vigliotto v. Terry, 873 F.2d 1201, 1203 (9th Cir.1989) (eighth amendment protects prisoners from searches performed solely for "calculated harassment").
 
 
 50
 Ante at 1142-43. I am not persuaded.
 
 
 51
 * First, it is far from clear that any policy will withstand an Eighth Amendment challenge so long as it is not "totally without penological justification." The quotation from Hoptowit in the passage set forth above, like the discussion in Vigliotto, does not purport to describe the constitutional minima. Rather, the class of activities prohibited by the Eighth Amendment "includes those sanctions that are 'so totally without penological justification that [they] result[ ] in the gratuitous infliction of suffering.' " Hoptowit, 682 F.2d at 1246 (quoting Gregg, 428 U.S. at 183, 96 S.Ct. at 2929 (joint opinion)) (emphasis added); see also Rhodes v. Chapman, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) ("Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.' ") (quoting Gregg ) (emphasis added); Michenfelder v. Sumner, 860 F.2d 328, 335 (9th Cir.1988) (same). Nothing in these cases requires that a policy be completely worthless to penological purposes in order for an Eighth Amendment claim to be sustained, no matter how serious the harm generated by the policy.
 
 
 52
 Nonetheless, the record here supports the district court's conclusion that the cross-gender searches were "without penological justification," Findings & Conclusions at 12 (p 28). The record reflects, and the district court found, that WCCW's security is not dependent upon cross-gender searches. The prison officials do not argue that WCCW's security has been impaired in the slightest during the pendency of the district court's injunctions, preliminary and permanent, which have now been in effect for two years. Although Superintendent Vail's predecessor voiced concerns about internal security and the need for random searches, these concerns have been met by the establishment of random and routine searches by female guards. Superintendent Vail himself confirmed as much at trial.
 
 
 53
 Nor do cross-gender searches ensure equal employment opportunities for male guards. The conflict between the right of one sex not to be discriminated against in job opportunities and the other to maintain some level of privacy "has normally been resolved by attempting to accommodate both interests through adjustments in scheduling and job responsibilities for the guards." Smith, 678 F.2d at 55; see also Gunther v. Iowa State Men's Reformatory, 612 F.2d 1079, 1087 (8th Cir.), cert. denied, 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980), overruled on other grounds, Kremer v. Chemical Constr. Corp., 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). At trial, the prison officials' own witnesses testified that not a single bid had been refused, promotion denied, nor guard replaced as a result of the ban on routine cross-gender searches.
 
 
 54
 Thus, no penological purpose for the cross-gender searches remains. Although the district court found that the random search policy was "addressed" to security, it also noted that the evidence demonstrated "that the security interests of the [WCCW] have been adequately fulfilled by the actions of its administrative officials, prior to the proposed policy change and during the period in which a preliminary injunction has been in effect in this case." Findings & Conclusions at 6 (p 19). And, of course, the district court concluded that "[t]he proposed random or routine cross-gender clothed body searches constitute the infliction of pain without penological justification, and cruel and unusual punishment in violation of the Eighth Amendment." Id. at 12 (p 28) (emphasis added). These latter findings were entirely consistent with the evidence.[4]
 
 
 55
 It appears that none of the Eighth Amendment cases decided by the Supreme Court, this circuit, or any other court of appeals has upheld a pain-inflicting measure simply because prison officials implemented the policy to "address" a legitimate governmental interest. Rather, other courts (and other panels within this court) have placed far more teeth in the "unnecessary and wanton" infliction test than the majority does today.
 
 
 56
 b
 
 
 57
 Although I agree with Judge Bryan that the cross-gender aspect of the search policy is "without penological justification," I do not believe that the Eighth Amendment demands so little of prison officials. In formulating its test, the majority has simply disregarded the "unnecessary and wanton" terminology which all courts have agreed is the appropriate test in this area.
 
 
 58
 From the discussion above, it should be evident that the cross-gender searches are "unnecessary," as I am sure the majority would agree. The tougher inquiry is whether the infliction of pain here could be considered "wanton." "Eighth Amendment claims based on official conduct that does not purport to be the penalty formally imposed for a crime require inquiry into [the prison officials'] state of mind...." Wilson v. Seiter, --- U.S. ----, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991). "It is obduracy and wantonness ... that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." Whitley, 475 U.S. at 319, 106 S.Ct. at 1084.
 
 
 59
 "[W]antonness does not have a fixed meaning but must be determined with 'due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged.' " Wilson, 111 S.Ct. at 2326 (quoting Whitley, 475 U.S. at 320, 106 S.Ct. at 1084). In Whitley, a prisoner was shot in the kneecap during or immediately following a prison riot. In an emergency, the prison guard's actions "are necessarily taken 'in haste, under pressure,' and balanced against 'competing institutional concerns for the safety of prison staff or other inmates.' " Id. (quoting Whitley, 475 U.S. at 320, 106 S.Ct. at 1084). In such extreme circumstances, the Court defined wantonness as "acting ' "maliciously and sadistically for the very purpose of causing harm." ' " Id. (quoting Whitley, 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973))).
 
 
 60
 In non-emergency situations, there is ordinarily not a clash with other important governmental responsibilities but rather plenty of time for reflection; then, " 'deliberate indifference' would constitute wantonness." Id. (quoting Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). In Wilson, the Court extended use of the "deliberate indifference" standard from cases of deprivation of medical care to all "prison conditions" cases. See id.
 
 
 61
 As in a prison conditions case, where prison officials formulate a policy in a non-emergency, there are no particular constraints on the officials' decisionmaking process which justify a requirement of "malice" for culpability. See Redman v. County of San Diego, 942 F.2d 1435, 1442 (9th Cir.1991) (en banc). Thus, the Supreme Court would apply the "deliberate indifference" standard to this circumstance to determine "wantonness."[5]
 
 
 62
 The record supports the conclusion that the inmates met their burden of establishing "deliberate indifference." Superintendent Vail indicated that he adopted the policy without a great deal of knowledge about the impact of the searches upon the inmates, see supra note 4, and that the policy was not required for security purposes. Yet long before the policy was actually implemented, Superintendent Vail was urged by members of his own staff not to institute cross-gender searches due to the psychological trauma which many inmates likely would suffer. Further, once the policy took effect, a court order was necessary to prevent the searches although one of the first inmates to be searched suffered a severe reaction. See supra note 2 and accompanying text. Even now, despite ample testimony of the harmful effects of this policy, the prison officials are intent upon reversing the district court injunction. See Redman, 942 F.2d at 1443 (prison officials may not act with reckless indifference to a particular vulnerability of which the officials know or should know).[6]
 
 
 63
 Under these circumstances, one must conclude that the prison officials' conduct in this matter has been "wanton." Judge Bryan properly found that the policy is "unnecessary and wanton," and that it lacks a penological justification.
 
 B
 
 64
 The prison officials propose use of another test altogether. They argue that the Eighth Amendment challenge, like all of the inmates' other assertions, should be measured under the "reasonableness" standard of Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), rather than by the traditional Eighth Amendment approach. I agree with the majority's tacit rejection of this approach.
 
 
 65
 Although the Supreme Court has stated broadly that "the standard of review we adopted in Turner applies to all circumstances in which the needs of prison administration implicate constitutional rights," Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028, 1038, 108 L.Ed.2d 178 (1990), Turner has been applied only where the constitutional right is one which is enjoyed by all persons, but the exercise of which may necessarily be limited due to the unique circumstances of imprisonment. See, e.g., id. (due process under Fourteenth Amendment); Turner, 482 U.S. at 91-99, 107 S.Ct. at 2262-67 (free association under First Amendment); Michenfelder, 860 F.2d at 332-36 (applying Turner to privacy and Fourth Amendment claims, but not to Eighth Amendment claim); Griffin v. Coughlin, 743 F.Supp. 1006, 1010-19 (N.D.N.Y.1990) (applying Turner to equal protection claim but not to Eighth Amendment claims); see also Vigliotto, 873 F.2d at 1203 (examining Eighth Amendment claim without reference to Turner ).[7] Eighth Amendment rights do not conflict with incarceration; rather, they limit the hardships which may be inflicted upon the incarcerated as "punishment." See Spain v. Procunier, 600 F.2d 189, 193-94 (9th Cir.1979) (Kennedy, J.) ("Whatever rights one may lose at the prison gates, ... the full protections of the eighth amendment most certainly remain in force.") (citations omitted). Perhaps for this reason, the Supreme Court has not applied Turner to an Eighth Amendment case.
 
 
 66
 Nonetheless, if one were to apply a Turner analysis to the inmates' Eighth Amendment claim, one should reach the same result. Nothing is "reasonable" about a policy which is "cruel and unusual," "unnecessary and wanton." Cf. Tribble, 860 F.2d at 325 n. 6 (noting that if searches violate Fourth Amendment under Turner, they may also violate Eighth Amendment to the extent they are shown to inflict pain). Although there is a rational connection between a random-search policy and security, there is no security or other reason for permitting cross-gender searches absent suspicion or emergency. The present policy of random searches by female guards suffices as a fully adequate alternative. Cf. Turner, 482 U.S. at 97-98, 107 S.Ct. at 2265-66 ("No doubt legitimate security concerns may require placing reasonable restrictions upon an inmate's right to marry.... The [challenged] regulation, however, represents an exaggerated response to such security objectives."). Nor does the record reflect that the injunction has resulted or would result in "a tremendous rearrangement of work schedules," Grummett, 779 F.2d at 494, or otherwise resulted in a negative "ripple effect," Michenfelder, 860 F.2d at 336, on the institution.
 
 C
 
 67
 Under any possible test, the inmates have established a violation of their Eighth Amendment right to be free from "cruel and unusual punishments." The record more than adequately supports the district court's finding of psychological harm, and the harm is sufficient to meet the constitutional minima. Furthermore, the infliction of this pain is "unnecessary and wanton" under the applicable legal standards. The district court's conclusion of law with regard to this claim should be upheld.
 
 III
 
 68
 Having identified an Eighth Amendment violation, one must then consider the propriety of the district court's remedy. "The district judge ha[s] the power only to correct the constitutional defects that he [or she] [finds]." Hoptowit, 682 F.2d at 1253; see also Toussaint v. McCarthy, 801 F.2d 1080, 1107-08 (9th Cir.1986) ("An injunction must be narrowly tailored to cure the constitutional violation and must not intrude on the functions of state officials unnecessarily."), cert. denied, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).
 
 
 69
 The district court designed its injunction narrowly. The prison officials are enjoined only from conducting "routine or random clothed body searches of female inmates which include touching of and around breasts and genital areas[ ] by male corrections officers" at WCCW. Findings & Conclusions at 14 (p 1) (issuing order of injunction). The court specifically noted that its decision "does not extend to cross gender searches under emergency conditions, cross gender searches of men by women, or cross gender searches at female institutions other than [WCCW]." Id. at 13 (p 33).
 
 
 70
 The prison officials have not challenged the scope of the injunction, instead focusing upon its raison d'etre. The injunction was appropriately tailored to prohibit the identified constitutional violation. The district court has not barred the implementation of random or routine suspicionless searches; in fact, these have continued during the two years since the cross-gender search policy was enjoined. Only non-emergency, suspicionless searches by male guards are forbidden.
 
 IV
 
 71
 It cannot be gainsaid that incarceration " 'brings about the necessary withdrawal or limitation of many privileges and rights,' " Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) (quoting Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948)), or that some conditions that are "restrictive and even harsh" can be "part of the penalty that criminal offenders pay for their offenses against society," Rhodes, 452 U.S. at 347, 101 S.Ct. at 2399. In this case we are presented with the prospect of serious psychological suffering, the infliction of which is demonstrably "unnecessary" and, in the constitutional sense of the word, "wanton." I seriously doubt that "standards of decency in modern society," Baumann v. Arizona Dep't of Corrections, 754 F.2d 841, 846 (9th Cir.1985), are met by the indifferent imposition of needless harm such as here.
 
 
 72
 The inmates have established a violation of their Eighth Amendment rights, justifying the district court's issuance of an injunction.
 
 
 73
 I respectfully dissent.
 
 
 
 *
 Honorable James M. Burns, United States District Judge, District of Oregon, sitting by designation
 
 
 [1]
 Breast area and groin area--The breast area shall be searched in a sweeping motion, using only the back of the hand. Do not cup the hand. The breasts of a female will be flattened by this method. Use a flat hand and pushing motion across the crotch area. Maintain a flat, inward pushing motion. The edge of the hand in a downward motion can be used to check the crease in the buttocks. Push inward and upward when searching the crotch and upper thighs of the inmate
 Washington Corrections Center for Women, Pat-Down Searches of Female Inmates, E.2.
 
 
 [2]
 The record does not substantiate the dissent's repeated assertion that the cross-gender search policy is unrelated to any penological purposes. E.g., Dissent at 271-73. Superintendent Vail repeatedly testified that he believed that cross-gender searches were the best means of controlling the movement of contraband in the facility. For example, Vail stated that:
 [F]rom a security point of view, if an inmate knows that there's three male officers on that side of the institution, then that's the time to move the contraband. If there's no expectation, no reasonable expectation that they might be stopped for a pat search, then it gives them a green light to go and move.
 Reporter's Transcript 12/18/89 at 680; see also id. at 671-72 (pat searches create an "unpredictable element in inmate movement throughout the institution so that inmates always have to be on guard a bit about packing contraband"); Reporter's Transcript 12/19/89 at 801 (cross-gender searches are necessary for a successful random search policy). He also testified that pulling women off post to perform searches in other areas of the institution could cause additional security problems such as potentially dangerous delays in conducting searches and moving inmates. Id. at 808. Vail's security concerns were corroborated by other prison officials. E.g., Reporter's Transcript 12/18/89 at 532-33 (Tana Wood, Assistant Director, Division of Prisons, Department of Corrections); id. at 559 (Lawrence Kincheloe, Director of Division of Prisons, Department of Corrections).
 The dissent also quickly dismisses the prison's other justification for the policy--the need to provide equal employment opportunities for all guards. The record is contrary to the dissent's position. Superintendent Vail testified at length concerning the labor problems caused by the prison's original single sex search policy. He pointed out that requiring women to perform all searches had resulted in employee discontent and conflicted with the bid system put in place by the collective bargaining agreement. Reporter's Transcript 12/18/89 at 680; Reporter's Transcript 12/19/89 at 784-85, 796. The district judge credited this testimony. E.g., Reporter's Transcript 12/22/89 at 1024 (general credibility finding); id. at 1040-41 (problems with collective bargaining agreement and equal employment opportunity); id. at 1047-48 (change in policy will require women to be pulled off post in the prison).
 In contrast to this testimony, the dissent claims that the record demonstrates that the cross-gender searches are not needed to accommodate labor concerns. Although citations to the record in support of this statement are not provided, the dissent may be relying in part on Vail's statement during cross-examination that he had managed to run the facility without cross-gender searches during the course of the appeal. Reporter's Transcript 12/19/89 at 749. However, Vail made it clear that this had been accomplished only "with the cooperation of the union." Id. The union's suspension of normal procedures to enable Vail to comply with a preliminary injunction in no way establishes that the search policy has no long-term labor effects.
 
 
 [3]
 The dissent proposes another legal standard. Under this test, we must strike down the search policy if we conclude that the search policy was unnecessary and that Superintendent Vail acted with deliberate indifference to the needs of the inmates. See Wilson v. Seiter, --- U.S. ----, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991). However, the Supreme Court has stated that deliberate indifference is the appropriate standard for culpability under the eighth amendment only when "the State's responsibility to attend to the ... needs of prisoners does not ... clash with other equally important governmental responsibilities." Id. (internal quotations omitted); see also id. (whether conduct "can be characterized as 'wanton' depends upon the constraints facing the official"). In this case, the search policy was implemented to address security and labor concerns, which are surely "important governmental responsibilities." However, even assuming that the dissent has stated the correct standard for culpability, it has not been met
 The dissent first argues that Vail was deliberately indifferent because the search policy was not the result of a "considered choice." Dissent at 1149 n. 4, 1149. This argument is directly contradicted by the district judge's own findings. In his oral decision, the judge stated that "[Vail] is trying to do the right thing for his institution, for his corrections officers, and also for the inmates in it.... His testimony, in my judgment, reflects that he has given this a great deal of thought [and] has educated himself about the problem over a long period of time." Reporter's Transcript 12/22/89 at 14. The record also reveals that Vail adopted the policy only after consulting with his supervisor and staff over a period of several weeks. Reporter's Transcript 12/18/89 at 665-69. Finally, Vail's decision to implement the policy was made with the knowledge that other institutions had cross-gender search policies, such that the "practice was pretty fundamental in a correctional facility." Reporter's Transcript 12/18/89 at 669.
 The dissent also argues that Vail was deliberately indifferent to the needs of the inmates, because he implemented the search policy in the face of some staff resistance, and has defended the policy despite evidence that cross-gender searches might be psychologically damaging. However, as stated above, the evidence of psychological harm is, at best, equivocal. The plaintiffs' witnesses produced no empirical data substantiating their predictions of harm, and some experts who testified at trial were of the opinion that the searches would have no adverse psychological effect. Given this disagreement, Vail can hardly be faulted for implementing the search policy. Cf. Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) (courts must give "wide-ranging deference" to a prison official's "adoption and execution of policies ... to maintain institutional security"). Similarly, in light of the conflicting trial evidence, Vail's failure to abandon the policy does not demonstrate "deliberate indifference" to the needs of the inmates.
 
 
 [1]
 The majority and both parties agree that the district court's findings of fact are subject to the "clearly erroneous" standard of review. See United States v. McConney, 728 F.2d 1195, 1200 & n. 5 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We must accept the district court's findings unless our review of the record leaves us " 'with the definite and firm conviction that a mistake has been committed.' " Id. at 1201 (quoting Pullman-Standard v. Swint, 456 U.S. 273, 285 n. 14, 102 S.Ct. 1781, 1788 n. 14, 72 L.Ed.2d 66 (1982) (quotation omitted)). The remarkable frequency with which the majority's view of the record is supported with citations to isolated expert and witness testimony, rather than to findings of fact, is troubling in light of our circuit's longstanding tradition of deference to district court credibility and fact determinations
 
 
 [2]
 This inmate, Sharon Hanson, later settled a suit for damages against the guard and prison officials for $1,000 plus $10,000 in attorney fees
 
 
 [3]
 The majority's observation that "expert opinions do 'not ordinarily establish constitutional minima' " is somewhat baffling. Ante at 1142 (parenthetical to, and quotation from, Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir.1982)). The inmates offered more than just expert testimony; some of them gave testimony themselves, see Findings & Conclusions at 3 (p 7), and the district court also considered the disastrous results of the cross-gender search of Sharon Hanson, see supra note 2 and accompanying text. In any event, that portion of Hoptowit to which the majority refers discusses the inadequacies of expert testimony on the issue of "evolving standards of decency," which is determined not by what experts would prefer but by "what the general public would consider decent." See Hoptowit, 682 F.2d at 1246. The reference has no relevance to an attempt to establish "probability of harm."
 
 
 [4]
 The Supreme Court has instructed us that "neither judge nor jury freely [may] substitute their judgment for that of officials who have made a considered choice." Whitley, 475 U.S. at 322, 106 S.Ct. at 1085, quoted in ante at 1142. By concluding that cross-gender searches are unjustifiable on this record, Judge Bryan has not violated this stricture. It is difficult to describe the new policy as a "considered choice"; Superintendent Vail noted at trial that he had formulated his policy "[n]ot with anywhere near the amount of knowledge I have at this point" concerning the likely impact on the inmates. Cf. Tribble, 860 F.2d at 327 n. 9 ("In view of the substantial evidence that ... defendants have exaggerated their response to purported security considerations, we do not defer to their expert judgment in these matters.") (citations omitted)
 
 
 [5]
 The majority concludes that the deliberate indifference standard may not apply here because of the existence of "equally important governmental responsibilities." Ante at 1144 n. 3. Judge Bryan, however, found that no penological purpose was served by cross-gender searches. Findings & Conclusions at 12 (p 28). The record simply does not support the notion that equally important governmental interests are presented in this case
 
 
 [6]
 Although Redman involves the Fourteenth Amendment's protections, the Eighth Amendment imposes a duty on prison officials at least as rigorous. Redman, 942 F.2d at 1442-43
 
 
 [7]
 But see Walker v. Sumner, 917 F.2d 382, 385-88 (9th Cir.1990) (applying one Turner factor to assertion that forced blood test violated Fourth, Eighth, and Fourteenth Amendments, without analyzing constitutional arguments separately); Michenfelder, 860 F.2d at 331 n. 1 (suggesting Turner's applicability to Eighth Amendment analysis, although later using traditional Eighth Amendment approach)