779 F.2d 491
 George GRUMMETT, John Weichman, Richard Johnson,
individually and on behalf of all others similarly
situated, Plaintiffs-Appellants,
v.
Ruth R. RUSHEN, Director, California Department of
Corrections; Reginald L. Pulley, Warden, San
Quentin State Prison, Defendants-Appellees.
 No. 84-2059.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 13, 1985.
Decided Dec. 26, 1985.
 
 Donald Specter, San Quentin, Cal., for plaintiffs-appellants.
 Tom Dove, Dep. Atty. Gen., San Francisco, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before SNEED, TANG and CANBY, Circuit Judges.
 TANG, Circuit Judge:
 
 
 1
 Plaintiffs, inmates at San Quentin prison ("inmates"), brought a class action seeking declaratory and injunctive relief under 28 U.S.C. Sec. 2201 (1982) and 42 U.S.C. Sec. 1983 (1982). The inmates asserted that the prison policy and practice of allowing female correctional officers to view male inmates in states of partial or total nudity while dressing, showering, being strip searched, or using toilet facilities violated rights of privacy guaranteed by the United States Constitution. The district court, 587 F.Supp. 913, granted summary judgment in favor of defendants, Director of California Department of Corrections and Warden of San Quentin State Prison ("the state"). For the reasons set forth below, we affirm.
 
 BACKGROUND
 
 2
 The California State Prison at San Quentin is one of the state's two highest security prisons. Officials have placed approximately two-thirds of the 3000 male felons in administrative segregation.
 
 
 3
 The physical structure of the prison permits observation of the inmates by institution officials at all times. Cells have solid walls with bars at the front. At the rear of each cell is a toilet. Presently, most showering facilities are cells of similar construction which have been converted into single occupant showers with bars at the front. Prison officials may view the cells from the tiers, on which the cells are located, or from the gunrail, a position overlooking the tiers. The view from the tiers is restricted from the gunrail by cell bars, the distance, and the angle from which prison officials look into and see the cells. One section, the West Block, still has common showering facilities in which inmates shower in one room under showerheads not separated by screens or walls. As in the other facilities, prison officials may observe inmates from the floor or gunrail. Exercise yards also have open showering and toilet facilities which may be observed from the gunrail above the yards.
 
 
 4
 Approximately 113 of the 720 correctional officers at San Quentin are female. Within the cells blocks, correctional officers are assigned to patrol the tier day and night. Patrolling involves walking down the tier periodically, to check and see that inmates are in their cells, and that they conduct themselves in accordance with prison regulations. Officers are also assigned to patrol the gunrail. These officers are armed and are responsible for the security of fellow guards and inmates. Both female and male correctional officers are assigned to patrol the cell block tiers and gunrails. Similar work assignments are given to supervise showering from the tiers and from the gunrails, but only male officers accompany inmates to the single occupancy showers and lock them inside the cell to disrobe and shower.
 
 
 5
 In the West Block, male officers supervise the common showers from the tier, and female officers supervise from the gunrail. Officers are also assigned to the gunrail above the exercise yard, but do not work on the yard floor. It is disputed whether female guards are assigned to this gunrail position. The evidence overall reflects that while the potential is great for female guards to view male inmates disrobing, showering, and using toilet facilities, the actual viewing is not frequent.
 
 
 6
 In the segregated housing units officers routinely conduct searches of unclothed inmates leaving or entering the unit. Female guards are not assigned to these positions and do not routinely conduct or observe unclothed body searches, but they have occasionally observed such searches in emergency situations. Female guards can conduct pat-down searches which include the groin area.
 
 
 7
 On February 4, 1982, three prisoners at San Quentin filed a complaint on behalf of themselves and all others similarly situated, claiming that their rights of privacy under the first, fourth, eighth, ninth and fourteenth amendments to the United States Constitution had been violated. On May 14, 1984, the district court granted summary judgment in favor of the state. The court concluded that the types of assignments given to female correctional officers and the manner in which the assignments were performed at San Quentin were reasonable and constitutionally permissible, and provided an appropriate balance among the institution's security needs, the female guards' right to equal employment opportunities, and the prisoners' privacy interests.
 
 DISCUSSION
 
 8
 I. The Right of Privacy in the Prison Context
 
 
 9
 It is well-established that convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison. Hudson v. Palmer, --- U.S. ----, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984); Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); Wolff v. McDonnell, 418 U.S. 539, 555-56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Prisoners are to be accorded those rights not fundamentally inconsistent with prisoner status or incompatible with the legitimate objectives of incarceration. Pell, 417 U.S. at 822, 94 S.Ct. at 2804 (upholding certain first amendment rights of prison inmates); Hudson v. Palmer, 104 S.Ct. at 3198. Specifically, prisoners enjoy the protections of due process. Wolff v. McDonnell, 418 U.S. at 555-56, 94 S.Ct. at 2974.
 
 
 10
 The state, however, may restrict or withdraw rights to the extent necessary to further the correctional system's legitimate goals and policies. Hudson v. Palmer, 104 S.Ct. at 3199; Bell, 441 U.S. at 545-46, 99 S.Ct. at 1877; Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Chief among those objectives is internal security. Hudson v. Palmer, 104 S.Ct. at 3199; Bell v. Wolfish, 441 U.S. at 547-48, 99 S.Ct. at 1878-79. Moreover, the adoption and execution of policies and practices by prison administrators is to be accorded deference by the judiciary. Block v. Rutherford, --- U.S. ----, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984) (citing Bell v. Wolfish, 441 U.S. at 547, 99 S.Ct. at 1878).
 
 
 11
 II. Rights Under the Fourteenth Amendment Privacy Guarantee
 
 
 12
 While no "right of privacy"[1] is expressly guaranteed by the Constitution, the Supreme Court has recognized that "zones of privacy" may be created by specific constitutional guarantees, thereby imposing limits upon governmental power. See Paul v. Davis, 424 U.S. 693, 712-13, 96 S.Ct. 1155, 1165-66, 47 L.Ed.2d 405 (1976); Roe v. Wade, 410 U.S. 113, 152-153, 93 S.Ct. 705, 726-727, 35 L.Ed.2d 147 (1973); Griswold v. Connecticut, 381 U.S. 479, 484-86, 85 S.Ct. 1678, 1681-83, 14 L.Ed.2d 510 (1965). The Supreme Court has pointed out that rights found in the guarantee of personal privacy are limited to those which are "fundamental" or "implicit in the concept of ordered liberty". Roe v. Wade, 410 U.S. at 152, 93 S.Ct. at 726 (citing Palko v. Connecticut, 02 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)).
 
 
 13
 To date the Supreme Court has recognized two types of interests protected by the right of privacy: an interest in avoiding disclosure of personal matters and an interest in personal autonomy in making certain kinds of important decisions. Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 876-877, 51 L.Ed.2d 64 (1977). The right of privacy protects private decision-making in certain matters related to marriage, procreation, contraception, abortion, family relationships, child rearing and education. Paul, 424 U.S. at 713, 96 S.Ct. at 1166. The Supreme Court has not recognized that an interest in shielding one's naked body from public view should be protected under the rubric of the right of privacy, yet it has explicitly noted that the outer limits of fourteenth amendment privacy have not been defined. Carey v. Population Services Int'l, 431 U.S. 678, 684-85, 97 S.Ct. 2010, 2015-16, 52 L.Ed.2d 675 (1977).
 
 
 14
 This court has had occasion to consider the interest in shielding one's naked body from public view. In York v. Story, 324 F.2d 450 (9th Cir.1963), cert. denied, 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964), a female filed a complaint of assault. Over her protest, a male police officer photographed her in the nude, in positions which did not show her injuries, and then distributed the photographs to other personnel in the police department. This court relied upon the fourteenth amendment as the source of the woman's protection, reasoning that the security of one's privacy against arbitrary intrusion by the police is basic to a free society and therefore "implicit in the concept of ordered liberty" under the due process clause. Id. at 455. We held that the plaintiff had stated a privacy claim under the fourteenth amendment, id. at 456, because we could not "conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." Id. at 455.
 
 
 15
 Assuming that, in this circuit, the interest in not being viewed naked by members of the opposite sex is protected by the right of privacy, our inquiry must focus on whether the female guards' conduct invaded the prisoners' interest. We might simply say that the situation of the San Quentin inmates is factually distinguishable from that of the plaintiff in York because they are prisoners and she was a complaining victim of a crime, and because the prison officials' observation of inmates is essential to prison security while the photographing of the complainant was not necessary to the investigation of the alleged crime. However, we prefer to follow the analytical framework established in the Supreme Court's privacy cases and reason that since the right of privacy is a fundamental right it may be restricted only if the limitation is justified by a "compelling state interest." Roe v. Wade, 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147 (1973).
 
 
 16
 The inmates do not contest the state's interest in searching and surveilling them to maintain prison security. Rather, they challenge the constitutionality of such search and surveillance when performed by members of the opposite gender. We are satisfied that the facts of this case establish that the prison authorities have devised the least intrusive means to serve the state's interest in prison security. See Wooley v. Maynard, 430 U.S. 705, 716, 97 S.Ct. 1428, 1436, 51 L.Ed.2d 752 (1976) (state achievement of its ends must be by the "less drastic means.")
 
 
 17
 Female guards are not assigned to positions requiring unrestricted and frequent surveillance. Rather, the positions to which they are assigned require infrequent and casual observation, or observation at a distance. Female guards working the tiers walk past the cells routinely, but do not stop for prolonged inspection. When they are not walking down the tiers, their view of the inmates in their cells is circumscribed by the cell bars and by the distance and angle of their stations. Likewise, the observations by the female correctional officers stationed on the gunrails overlooking the tiers and the yard areas are obscured by the angle and distance of their locations.[2] Female guards do not accompany male inmates to the individual or gang showers, and are not stationed on the tiers where the showers are located. Females are assigned to the more distant gunrail position overlooking showers, where, again, the surveillance is obscured. Under these circumstances, the inmates have not demonstrated that these restricted observations by members of the opposite sex are so degrading as to require intervention by this court. Accord Lee v. Downs, 641 F.2d 1117 (4th Cir.1981); Avery v. Perrin, 473 F.Supp. 90 (D.N.H.1979).
 
 
 18
 Similarly, routine pat-down searches, which include the groin area, and which are otherwise justified by security needs, do not violate the fourteenth amendment because a correctional officer of the opposite gender conducts such a search. Accord Bagley v. Watson, 579 F.Supp. 1099 (D.Or.1983); Smith v. Fairman, 678 F.2d 52 (7th Cir.1982), cert. denied, 461 U.S. 907, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983). These searches do not involve intimate contact with an inmate's body, and the record indicates that the female guards have conducted themselves in a professional manner. Furthermore, female officers are not assigned positions in which they conduct or observe strip or body cavity searches. Rather, the record indicates that only in two or three emergency situations have female guards observed unclothed body searches. Even if we conclude that such a situation represents an invasion of privacy rights, we cannot conclude, on this record, that the observations by the female officers were not justified by emergent circumstances. Accord Lee v. Downs, 641 F.2d 1117, 1119-21 (4th Cir.1981); Hudson v. Goodlander, 494 F.Supp. 890, 894 (D.Md.1980).
 
 III. Rights Under the Fourth Amendment
 
 19
 The inmates also contend that the actions of the female correctional officers violate their rights under the fourth amendment. They maintain that what are otherwise "reasonable searches" become unreasonable when conducted by a guard of the opposite sex. For reasons similar to those in the preceding section, we conclude that there has been no violation of the inmates' fourth amendment rights.
 
 
 20
 In considering the reasonableness, under the fourth amendment, of the female guard's conduct, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell v. Wolfish, 441 U.S. at 559, 99 S.Ct. at 1884; Giles v. Ackerman, 746 F.2d 614, 616 (9th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985).
 
 
 21
 Assuming, without deciding, that the guards' surveillance of the inmates in their cells, in the showers, and from the play yard are "searches" for purposes of the fourth amendment, we cannot conclude, on this record, that this conduct is unreasonable and therefore prohibited by the fourth amendment. The physical setup of San Quentin permits viewing of inmates at almost all times, but the viewing is not unrestricted. Rather, the observations of inmates are restricted by distance and are casual in nature. While the potential for viewing the inmates unclothed may be great, the record indicates that such actual viewing of the inmates is infrequent and irregular. Female guards are not stationed at those positions which involve close and prolonged surveillance of disrobed inmates; for example, they do not work the tiers where the showers are located.
 
 
 22
 The inmates do not challenge whether internal security needs justify such surveillance. To restrict the female guards from positions which involve occasional viewing of the inmates would necessitate a tremendous rearrangement of work schedules, and possibly produce a risk to both internal security needs and equal employment opportunities for the female guards. We conclude, therefore, that such surveillance is justified under the fourth amendment.[3]
 
 
 23
 Likewise, we conclude that the pat-down searches conducted by the female guards are not so offensive as to be unreasonable under the fourth amendment. These searches are done briefly and while the inmates are fully clothed, and thus do not involve intimate contact with the inmates' bodies. The record indicates that the searches are performed by the female guards in a professional manner and with respect for the inmates. Therefore such searches are acceptable under the fourth amendment. Bagley, 579 F.Supp. at 1103.
 
 
 24
 The record indicates that the female guards do not routinely conduct or observe strip or body cavity searches. It has been shown that only on two or three occasions, in emergency situations, have female guards observed strip searches. The prisoners have not shown that such action was not justified under the emergent circumstances. We conclude that the interest in prison security justifies such observations in emergency situations. Accord Lee v. Downs, 641 F.2d at 1119-21; Hudson v. Goodlander, 494 F.Supp. at 894.
 
 CONCLUSION
 
 25
 For the reasons set forth above, we are satisfied that prison officials in this case have struck an acceptable balance among the inmates' privacy interests, the institution's security requirements, and the female guards' employment rights. The female guards are restricted in their contact with the inmates, and the record clearly demonstrates that at all times they have conducted themselves in a professional manner, and have treated the inmates with respect and dignity.
 
 
 26
 Accordingly, the judgment of the district court is
 
 
 27
 AFFIRMED.
 
 
 28
 SNEED, Circuit Judge (concurring in the result):
 
 
 29
 I readily concur in the result reached by the court. However, I differ fundamentally with the analytic structure employed by the court in reaching its result. Whereas the court assumes that a prisoner, like all other citizens, has a right not to be viewed naked by members of the opposite sex rooted in the Fourth Amendment's right of privacy, I commence my analysis by recognizing that "[l]oss of freedom of choice and privacy are inherent incidents of confinement." See Bell v. Wolfish, 441 U.S. 520, 537, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979).
 
 
 30
 Having started at different points, it must follow that the next step in the court's analytic structure will differ from mine. Whereas the court asserts that the issue is whether the prisoner's right of privacy was limited in a manner justified by a "compelling state interest," I phrase the issue as whether the use of female guards in the San Quentin manner infringes either upon the residual rights of privacy that a prisoner might possess or constitutes such an unusual punishment.
 
 
 31
 The court and I agree that our respective issues should be resolved against the plaintiffs. Our formulations, however, differ. Whereas the court, after carefully examining the use of female guards at San Quentin, concludes that compelling state interests are served by their use, I would conclude merely that on the record before us no residual rights of privacy were infringed and that the use of female guards did not contravene the Eighth Amendment. So long as the procedures employed by San Quentin are reasonably and humanely related to the maintenance of security and order therein, I would find no constitutional infringement of the sort asserted here.
 
 
 32
 These differences are worth mentioning only because the court's approach can contribute significantly to the further constitutionalization of prison procedures. To some extent constitutionalization has been necessary to preclude gross neglect by governments of their prison systems. Nothing, however, can be carried too far so quickly as a good idea. My approach in this case is to place in the constitutionalization roadway a flashing amber light.
 
 
 
 [1]
 We will limit discussion to the inmates' privacy rights under the fourth and fourteenth amendments. The prisoners' claims are best supported analytically under the fourth amendment's guarantee of one's legitimate expectation of privacy against unreasonable searches and seizures, see generally Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and under the liberty component of the fourteenth amendment, see generally Whalen v. Roe, 429 U.S. 589, 598-600, 97 S.Ct. 869, 875-877, 51 L.Ed.2d 64 (1977). The inmates do not refer to the type of harm protected by the right of free association under the first amendment, see Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), or to the type of shocking and barbarous treatment protected against by the eighth amendment, see Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). The ninth amendment provides little analytic or precedential support for the inmates' claims. But see Griswold v. Connecticut, 381 U.S. 479, 486-87, 85 S.Ct. 1678, 1682-83, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring)
 
 
 [2]
 As noted previously, the state disputes whether female guards are stationed overlooking the yard
 
 
 [3]
 The State argues that the recent decision of Hudson v. Palmer, --- U.S. ----, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), disposes of the inmates' privacy claims under the fourth and fourteenth amendments. In Hudson, the Supreme Court held that a prisoner had no legitimate expectation of privacy in his prison cell, and therefore derived no protection from the fourth amendment against unreasonable searches and seizures. Id., 104 S.Ct. at 3200. The Court assumed, since there was no suggestion to the contrary, that any privacy rights the prisoners had under the fourteenth amendment did not exceed those under the fourth
 Since we conclude that neither the inmates' fourth nor fourteenth amendment rights have been violated, we need not determine the precise scope of protections under each, but merely acknowledge that the rights are not necessarily coextensive.
 The state also argues that under Hudson, the inmates do not have any legitimate expectation in the privacy of their cells, and thus have no basis, under the fourth amendment, upon which to complain of any surveillance within their cells. While language in the majority opinion of Hudson supports the state's position, see, e.g., Hudson v. Palmer, 104 S.Ct. at 3200, Hudson involved the search of a prisoner's personal effects, not his person. Because we conclude that the surveillance is reasonable under the fourth amendment, we do not decide whether Hudson is to be extended to the search of the prisoner himself, inside his cell.