Keith SOMERS, Plaintiff–Appellee,

v.

Otis THURMAN, Warden; John Ratelle, Warden; C. Lovvorn; H. Castango; J. Volletti; Jesse Miles; unknown Martinez; unk. Booke; unk. Porter; unk. Brown, Defendants,

and

Brenda Cash; unk. Walls; unk. Shabazz; unk. Wheat; unk. Gomez; unk. Ferguson; unk. Johnson; unk. Rivera, Defendants–Appellants.

No. 96–55534.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 1997.

Decided March 25, 1997.

As Amended May 28, 1997.

Craig S. Nelson, Deputy Attorney General, San Diego, California, for the defendants-appellants.

James A. Frieden, Santa Monica, California, for the plaintiff-appellee.

Before D.W. NELSON and TROTT, Circuit Judges, and BRYAN,* District Judge.

TROTT, Circuit Judge:

## I. OVERVIEW

Female prison guards (collectively, "Officials") appeal a district court order denying them qualified immunity in a male prisoner's civil rights action brought pursuant to 42 U.S.C. § 1983. California state prisoner

* The Honorable Robert J. Bryan, United States District Judge for the Western District of Washington, sitting by designation.

Keith Somers sued the Officials and their supervisors for $1,000,000 in damages, alleging that visual body cavity searches performed by the female Officials, as well as being watched by them while showering naked, violated his constitutional rights under both the Fourth and the Eighth Amendments. In addition, Somers alleged that the Officials "pointed at him" and "joked among themselves" during the searches and during his showers, behavior he characterizes as "gawking." We must determine whether the Officials' conduct violated Somers's clearly established Fourth or Eighth Amendment rights of which the Officials should have been aware at the time of these occurrences. The district court ruled that it did. We reverse.

## II. BACKGROUND

From October 15, 1993 to September, 1994, Somers was incarcerated in California State Prison–Los Angeles, serving a fifteen-year-to-life sentence for second-degree murder.[1] During his imprisonment, female prison guards allegedly subjected Somers to visual body cavity searches on a regular basis.[2] During the searches, the Officials "pointed at" Somers and made "jokes among themselves." These searches violated prison regulations prohibiting unclothed body inspections by correctional employees of the opposite sex except under emergency conditions. When Somers complained that he did not want to be searched by female guards, he was given a choice between submitting to the searches or going to the "hole" (administrative segregation).

In accordance with general prison practice, the Officials also monitored Somers while he

showered. During the showers, the female guards "pointed at Somers" and made "jokes among themselves." Somers does not allege that the Officials' comments were directed at him, intended to humiliate him, or even that he heard what any of the Officials allegedly said.

Because of this treatment, Somers filed a civil rights action seeking $1,000,000 in punitive damages. The Officials moved for judgment on the pleadings, asserting that they were entitled to qualified immunity. The district court adopted the magistrate judge's eighteen-page decision denying the Officials qualified immunity. The district court concluded that the Complaint properly alleged facts showing that the Officials violated Somers's clearly established constitutional rights. The Officials appeal this decision.[3]

## III. STANDARD OF REVIEW

■ We review the denial of qualified immunity de novo. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir.1993).

## IV. DISCUSSION

We note at the outset that because Somers chose to seek only monetary and not equitable relief, we are not asked to determine what the law commands today, but only whether, at the time alleged, the asserted rights as he describes them were clearly established constitutional principles.

The doctrine of qualified immunity protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does

---

1. The relevant facts are taken from the First Amended Complaint ("Complaint"). Although Somers's attorney included excerpts from a "Second Amended Complaint" in his brief, that complaint was not before the district court. We therefore do not consider it.

2. Because the Officials have moved for qualified immunity based on the failure to state a claim, we take all allegations in the complaint as true. *See Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir.1996). We state the facts as they are alleged by Somers in his complaint.

3. On June 24, 1996, we ordered the Officials to address the appealability of the district court's order denying the Officials' motion for judgment

on the pleadings in light of *Johnson v. Jones*, —— U.S. ——, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). In *Johnson*, the Supreme Court held that a district court's ruling on summary judgment that the record raised a genuine issue of fact concerning an official's involvement in the case was not a "final decision" and was not immediately appealable. However, in *Behrens v. Pelletier*, —— U.S. ——, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), the Supreme Court subsequently concluded that rulings on whether "the federal right allegedly infringed was 'clearly established'" are immediately appealable. Thus, the Officials may immediately appeal the district court's determination that the Officials violated Somers's clearly established rights.

not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). While public officials are thus generally protected from civil liability under the doctrine, the defense will fail where their actions violate law that is clearly established, because "a reasonably competent public official should know the law governing his conduct." *Id.* at 819, 102 S.Ct. at 2738. "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 343, 106 S.Ct. 1092, 1096, 1097, 89 L.Ed.2d 271 (1986)).

To determine whether an official is entitled to qualified immunity, we conduct a two-part analysis: (1) We consider whether the law governing the official's conduct was clearly established. If it was not clearly established, the official is entitled to immunity from suit. (2) If the law was clearly established, we proceed to ask if under that law, a reasonable official could have believed the conduct was lawful. *See Act Up!/Portland*, 988 F.2d at 871. Therefore, an official is denied qualified immunity only if the law was clearly established and a reasonable official could not have believed the conduct was lawful.

We are concerned in this case only with the first inquiry: whether Somers carried his burden of proving that the Officials violated his clearly established Fourth or Eighth Amendment rights. If the formulation of the law on which he relies was not clearly established at the time the acts occurred, "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he [or she] fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. Under such circumstances, the Officials are entitled to immunity. *Id.* Therefore, we must determine whether, at the time of the alleged conduct, a male inmate had clearly established Fourth or Eighth Amendment rights to be free from routine visual body cavity searches and shower viewing by female guards.

## A. The Fourth Amendment

As an initial matter, we must determine whether a prisoner possessed at the relevant time some limited rights cognizable under the Fourth Amendment.[4] The Supreme Court had not spoken definitively on this issue, nor has it today. *See Grummett v. Rushen*, 779 F.2d 491, 494 (9th Cir.1985) ("The Supreme Court has not recognized that an interest in shielding one's naked body from public view should be protected under the rubric of the right of privacy...."). In *Bell v. Wolfish*, 441 U.S. 520, 558–60, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447 (1979), the Court assumed *arguendo* that prisoners retain some right of privacy under the Fourth Amendment, but concluded that the challenged strip searches were reasonable. Five years later, however, the Court held that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984).

Although *Hudson's* holding is limited to prisoners' privacy rights within their cells, its dicta indicates that the Court may have intended to strip the inmates of all Fourth Amendment privacy rights:

> A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that "[l]oss of free-

---

4. The Fourth Amendment provides "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures...." U.S. Const. amend. IV.

dom of choice and privacy are inherent incidents of confinement." *Bell v. Wolfish,* 441 U.S. at 537, 99 S.Ct. at 1873.

*Hudson,* 468 U.S. at 527–28, 104 S.Ct. at 3200–01 (footnote omitted). Further, the Court noted that its "holding that [a prisoner] does not have a reasonable expectation of privacy enabling him to invoke the protections of the Fourth Amendment does not mean that he is without a remedy for calculated harassment unrelated to prison needs.... The Eighth Amendment always stands as a protection against 'cruel and unusual punishments.'" *Id.* at 530, 104 S.Ct. at 3202. Therefore, it is unclear from the dicta in *Hudson* whether prisoners retain any rights cognizable under the Fourth Amendment against searches qua searches of their bodies, or whether the only safeguard against assertedly egregious searches in prison is the Eighth Amendment.

Relying directly on the Court's guidance in *Hudson,* the Seventh Circuit has recently held in a 2—1 decision that "the [F]ourth [A]mendment does not protect privacy interests within prisons." *Johnson v. Phelan,* 69 F.3d 144, 150 (7th Cir.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 506, 136 L.Ed.2d 397 (1996). Although *Johnson* was decided after the Officials' conduct about which Somers complains, the case illustrates how the Supreme Court's sweeping utterances in *Hudson*–which does predate the conduct-have been interpreted. Therefore, although the relevant inquiry for purposes of establishing qualified immunity is limited to the state of the law at the time the alleged conduct took place, we look to *Johnson* to demonstrate what a reasonable official would have understood the law to be in the light of *Hudson.* For example, *Johnson* describes *Hudson* as standing for the proposition that "privacy is the thing most surely extinguished by a judgment committing someone to prison." *Johnson,* 69 F.3d at 146.

In *Johnson,* a prison inmate challenged a state prison policy allowing female guards to monitor and observe male inmates in their cells, showers, and using their toilets. *Id.* at 145. In turning away their Fourth Amendment challenge, the court noted that "[i]nterprisoner violence is endemic, so constant vigilance without regard to the state of the prisoners' dress is essential. Vigilance over showers, vigilance over cells-vigilance everywhere, which means that guards gaze upon naked inmates." *Id.* at 146.

In support of cross-gender monitoring of the prisoners, the *Johnson* court identified two interests. First, "an interest in efficient deployment of staff supports cross-sex monitoring." *Id.* at 147. "There are too many permutations to place guards and prisoners into multiple classes by sex, sexual orientation, and perhaps other criteria, allowing each group to be observed only by the corresponding groups that occasion the least unhappiness." *Id.* Second, cross-gender monitoring reduces the need to make gender a criterion of employment, and "therefore reduces the potential for conflict with Title VII and the equal protection clause." *Id.* With these justifications in mind, the *Johnson* court also rejected the inmates' Eighth Amendment challenge, observing that any practice acceptable under the analysis of *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), as "reasonably related to legitimate penological interests," *id.* at 89, 107 S.Ct. at 2261, is necessarily acceptable under the Eighth Amendment. *Johnson,* 69 F.3d at 148.

Other circuits have recognized that inmates retain limited rights to bodily privacy for purposes of the Fourth Amendment. *See Fortner v. Thomas,* 983 F.2d 1024, 1030 (11th Cir.1993) ("recognizing a prisoner's constitutional right to bodily privacy because most people have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating") (internal quotation and citation omitted); *Covino v. Patrissi,* 967 F.2d 73, 78 (2d Cir.1992) (concluding that "we have little doubt that society is prepared to recognize as reasonable the retention of a limited right of bodily privacy even in the prison context"); *Cornwell v. Dahlberg,* 963 F.2d 912, 916 (6th Cir.1992) ("[T]his Circuit has joined others in recognizing that a convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those

enjoyed by non-prisoners."). Thus, the Seventh Circuit stands alone in its peremptory declaration that prisoners do not retain a right to bodily privacy.

Our Circuit first established a Fourteenth Amendment Due Process right to bodily privacy in *York v. Story*, 324 F.2d 450 (9th Cir.1963), a case involving the misuse by police of nude photos taken for evidentiary purposes of the female victim of an assault. In *York*, we noted that "[t]he desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *Id.* at 455. We "assumed" in 1985 that this right covered prison inmates in *Grummett*. In *Grummett*, prison inmates challenged a prison policy allowing female officers to view male prisoners while disrobing, showering, and using toilet facilities. We concluded that the inmates had not demonstrated that "restricted observations by members of the opposite sex [were] so degrading as to require intervention by this court." 779 F.2d at 495 (citation omitted). Further, we noted that restricting female guards from serving in "positions which involve occasional viewing of the inmates would necessitate a tremendous rearrangement of work schedules, and possibly produce a risk to both internal security needs and equal employment opportunities for the female guards." *Id.* at 496. We concluded that such surveillance is permissible under the Fourth Amendment. *Id.* As for *Hudson*, we said that it provided support for the State's argument that the Supreme Court's holding and language foreclosed the prisoners' privacy claims, but we declined to decide whether *Hudson* "is to be extended to the search of the prisoner himself, inside his cell." *Id.* at 496 n. 3.

Noteworthy in *Grummett* is Judge Sneed's concurrence in which he concludes on the basis of *Bell v. Wolfish* that no residual rights of privacy had been infringed, and that the use of female guards to manage nude-male prisoners did not contravene the Eighth Amendment. *Id.* at 496 (Sneed, J., concurring in the result).

In *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir.1988), a male prison inmate alleged that routine visual body cavity searches sometimes performed within view of female prison guards violated the Fourth and Eighth Amendments. Although we articulated "a prisoner's limited right to bodily privacy," we rejected their case. Applying the test of *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and invoking *Wolfish*, we acknowledged both the legitimate penological interest in providing equal employment opportunities to women guards and the security interest in deploying available staff effectively. *Id.* at 334. We took note also of the limited nature of the guards' involvement in the strip searches. The female guards' observations were made from a control booth's video monitors that provided a limited view of the searches. *Id.* We also said that "[e]vidence of female officers' role in shower duty likewise did not establish an inappropriate amount of contact with disrobed prisoners." *Id.*

In 1992, we decided *Sepulveda v. Ramirez*, 967 F.2d 1413 (9th Cir.1992). *Sepulveda* involved a male parole officer who walked into the bathroom stall where Sepulveda, a female parolee, was urinating as part of a required drug test. In denying the officer qualified immunity, we said that Sepulveda's "experience was far more degrading to [her] than the situation faced by the inmates in *Grummett*." 967 F.2d at 1416. In addition, we stated that the constitutional "rights of parolees are even more extensive than those of inmates." *Id.* In dissent, Judge O'Scannlain commented that:

> [B]oth times this circuit has addressed the question, it has *permitted* prison officials to view unclothed inmates of the opposite sex. We have engaged in balancing of inmates' interest in not being viewed unclothed with the administrative needs of the prison. Thus, we have permitted female guards to view unclothed male prisoners, where "the positions to which they are assigned require infrequent and casual observation, or observation at a distance." *Grummett v. Rushen*, 779 F.2d 491, 494 (9th Cir.1985). We have also held that the Constitution does not bar female guards from occasionally being present at strip searches of men or from routinely serving on shower duty in a men's prison. *Michenfelder v. Sumner*, 860 F.2d 328, 330,

334 (9th Cir.1988). In sum, this circuit has never held that the Constitution is violated by the mere fact of a prison official viewing the unclothed body of an inmate of the opposite sex, and has not even addressed the question of bodily privacy rights parolees may have in connection with drug testing.

*Id.* at 1418 (O'Scannlain, J., dissenting).

Somers argues that *Michenfelder, Grummett,* and *Sepulveda* clearly established his right to be free from the up close, intentional, strip searches by the female guards in this case. But as Judge O'Scannlain noted, we have never held that a prison guard of the opposite sex cannot conduct routine visual body cavity searches of prison inmates-nor did we so hold in *Sepulveda.* *Sepulveda* involved the rights of a parolee, whose rights are "more extensive than those of inmates." *Id.* at 1416. Nor have we ever held that guards of the opposite sex are forbidden from viewing showering inmates.

Taken together, however, one might read *Grummett, Michenfelder,* and *Sepulveda* to suggest that up close, frequent, and intentional viewings by guards of the opposite sex could violate a prisoner's privacy rights. In fact, the able magistrate judge in the instant case reached this very conclusion. In 1993, however, an en banc panel of our court took us in a different direction. In *Jordan v. Gardner,* 986 F.2d 1521 (9th Cir.1993) (en banc), we stated:

> Whether such rights exist-*whether the inmates possess privacy interests that could be infringed by the cross-gender aspect of otherwise constitutional searches-is a difficult and novel question,* and one that cannot be dismissed lightly. But we cannot assume from the fact that the searches cause immense anguish that they therefore violate protected Fourth Amendment interests. Far from it, *our prior case law suggests that prisoners' legitimate expectations of bodily privacy from persons of the opposite sex are extremely limited. See Grummett v. Rushen,* 779 F.2d 491, 495–96 (9th Cir.1985) (pat-down searches of male inmates that included groin area by female guards do not violate Fourth Amendment); *Michenfelder,* 860 F.2d at 334 (occasional visual strip

searches of male inmates by female guards do not violate Fourth Amendment).

\* \* \*

> Although the inmates here *may have protected privacy interests* in freedom from cross-gender clothed body searches, such interests have not yet been judicially recognized.

*Jordan,* 986 F.2d at 1524–25 (emphasis added). Therefore, *Jordan* is important to our determination of whether Somers's rights were clearly established in 1993 because: 1) although citing *Michenfelder* and *Grummett,* it states that whether inmates possess privacy interests that could be infringed by cross-gender searches is a difficult and novel question; and 2) it cites *Michenfelder* and *Grummett* for the proposition that Ninth Circuit case law suggests that prisoners' legitimate expectations of bodily privacy from persons of the opposite sex are extremely limited.

■ In light of our en banc statements in *Jordan,* which strongly echo what the *Hudson* Court said about a prisoner's privacy rights, we cannot say that by the time the alleged conduct took place in October 1993, eight months after we decided *Jordan,* male inmates had *clearly established* Fourth Amendment privacy interests prohibiting the cross-gender searches in the instant case. After *Jordan,* the contours of Somers's right were not "sufficiently clear that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Therefore, the unlawfulness (if it even was unlawful) of the Officials' cross-gender search was by no means apparent. *See id.*

As further support for our conclusion that the alleged right was not clearly established, we note that a district court in our circuit has held, after *Jordan,* that the Constitution does not prohibit a female guard from viewing an unclothed male inmate under circumstances where the identical viewing would be proper if the viewer were a male guard. *Canell v. Armenikis,* 840 F.Supp. 783, 784 (D.Or.1993). In *Canell,* a prison inmate "object[ed] to the presence of female guards who view inmates unclothed and while performing bodily func-

tions." *Id.* at 783. The viewings were up-close, frequent, and, at times, intentional. *Id.* at 784. In rejecting the idea that the guards violated the inmate's constitutional rights, Judge Panner stated:

> Accordingly, the question presented here, which has apparently never been decided by the Ninth Circuit, is whether the [C]onstitution prohibits a female guard from viewing an unclothed male inmate under circumstances where the identical viewing would be proper if the viewer was a male guard. I hold that it does not. So long as there is sufficient justification for a guard to view an unclothed male inmate, and the guard behaves in a professional manner, the gender of the guard is irrelevant. I emphasize that this case does not present the special concerns so eloquently articulated by the court in *Jordan v. Gardner,* 986 F.2d 1521 (9th Cir.1993) (en banc).

*Id.* at 784. Significantly, *Canell* was decided on December 15, 1993, after the cases relied upon by the district court and during the time the alleged violations took place in the instant litigation. Although not dispositive of the actual rights possessed by the prisoners, *Canell* is probative of whether the law was indeed *clearly established.* Judge Panner cited both *Grummett* and *Michenfelder* in his opinion, yet did not read into those cases the implication discussed above-that up close and routine viewings by guards of the opposite gender would violate an inmate's Fourth Amendment rights.

In addition to Judge Panner's post-*Jordan* interpretation of inmates rights, a prisoners' rights treatise published after *Jordan* bluntly states that "[t]he Ninth Circuit Court of Appeals has held that a prison policy of allowing female correctional officers to view male inmates in states of partial or total nudity while dressing, showering, being strip searched, or using toilet facilities does not violate the male inmates' rights of privacy under the Fourth Amendment." 1 Michael Mushlin, *Rights of Prisoners* § 8.11, at 394 (2nd ed.1993). Significantly, the author cited *Grummett* and *Michenfelder* in support of this proposition. Although not dispositive as to the state of the law, it is further evidence that Somers's alleged rights were not clearly established in 1993.

In support of his decision, the magistrate judge here also noted that the "Department of Corrections regulation existing at the time of the events alleged in the complaint mirror the current standards of the law and bolster the conclusion that plaintiff's right to privacy during the alleged searches was clearly established." California Code of Regulations section 3287 provides in part:

> Correctional employees, other than qualified medical staff, shall not conduct unclothed body inspections of inmates of the opposite sex except under emergency conditions with life or death consequences.... Routine inspections of clothed inmates of either sex may be performed by employees of either sex.

■ First, we note that Somers does not allege that the regulation creates any sort of a liberty interest protected by the Constitution: he makes no Fourteenth Amendment claim. Second, we do not believe that, after *Jordan,* this regulation "mirrors the law" in our circuit. As discussed above, *Jordan* makes unclear the extent of inmates' Fourth Amendment rights. In any event, the departure from the prison regulation does not automatically strip the Officials of their qualified immunity. *See Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some [state] statutory or administrative provision."); *Sandin v. Conner,* ─── U.S. ───, ───, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995) (noting that state prison regulations are "not designed to confer rights on inmates").

■ It is thoroughly inconsistent with the rationale underlying the doctrine of qualified immunity to hold individuals personally liable for conduct not previously clearly identified as unlawful. Government officials are not required to anticipate subsequent legal developments, and, as *Harlow* says, cannot fairly be said to "know" the law unless it is sufficiently unmistakable from authoritative sources. It is not even enough to demonstrate that the constitutional norm relied on is the logical extension of principles and decisions already in the books. *Mitchell v. Forsyth,* 472 U.S. 511, 517, 105 S.Ct. 2806, 2810-

11, 86 L.Ed.2d 411 (1985). As the Supreme Court said in *Anderson:*

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

483 U.S. at 640, 107 S.Ct. at 3039 (internal citation omitted).

Thus, it is highly questionable even today whether prison inmates have a Fourth Amendment right to be free from routine unclothed searches by officials of the opposite sex, or from viewing of their unclothed bodies by officials of the opposite sex. Whether or not such a right exists, however, there is no question that it was not clearly established at the time of the alleged conduct. Because Somers's lawsuit seeks only monetary damages, not injunctive relief, we do not decide whether such a right exists. Accordingly, we reverse the order of the district court and remand with instructions to grant the Officials qualified immunity on Somers's Fourth Amendment claim.[5]

### B. The Eighth Amendment Claim

The Supreme Court has stated that only the " 'the unnecessary and wanton infliction of pain' ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment."[6] *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (quoting *Ingraham v. Wright,* 430 U.S. 651, 670, 97 S.Ct. 1401, 1412, 51 L.Ed.2d 711 (1977)) (citation omitted). Moreover, "[i]t is *obduracy and wantonness, not inadvertence or error in good faith,* that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct

occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (quoting *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084). Thus, courts considering a prisoner's claim must ask: 1) if the officials acted with a sufficiently culpable state of mind; and 2) if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 999–1000, 117 L.Ed.2d 156 (1992) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 303, 111 S.Ct. 2321, 2326–27, 115 L.Ed.2d 271 (1991)).

■ We conclude that Somers's claim fails under both the "subjective" and the "objective" components of the *McMillian* analysis. Somers therefore cannot successfully meet his burden of proving that the Officials violated clearly established law. Nowhere in Somers's Complaint does he allege that the searches occurred without any penological justification. Moreover, his allegations merely assert that the Officials pointed and joked "among themselves." He does not allege that any of the Officials intended to humiliate him. Therefore, Somers's contentions do little to prove that the Officials acted with a "sufficiently culpable state of mind." *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324.

Nor do his contentions establish conduct objectively harmful enough to establish a constitutional violation. We are mindful of the realities of prison life, and while we do not approve, we are "fully aware that the exchange of verbal insults between inmates and guards is a constant, daily ritual observed in this nation's prisons." *Morgan v. Ward,* 699 F.Supp. 1025, 1055 (N.D.N.Y. 1988). Therefore, even if we take Somers's allegations as true, they do not rise to the level of an Eighth Amendment violation.

---

5. This is not to say that an abusive cross-gender visual body cavity search was per se reasonable under the Fourth Amendment in 1993 or today. Although we are "fully aware that the exchange of verbal insults between inmates and guards is a constant, daily ritual observed in this nation's prisons," *Morgan v. Ward,* 699 F.Supp. 1025, 1055 (N.D.N.Y.1988), the purposeful subjection of prisoners to verbal assaults during strip searches performed by officials of the other sex serves no administrative purpose and might pres-

ent a question under the Fourth Amendment. We need not wrestle with this question today because Somers' conclusory allegations fail to describe conduct that is sufficiently abusive to strip the officials of their qualified immunity.

6. The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

Cross-gender searches "cannot be called inhumane and therefore do[ ] not fall below the floor set by the objective component of the [E]ighth [A]mendment." *Johnson*, 69 F.3d at 151. The facts of cases in which courts have found Eighth Amendment violations are more severe. In *McMillian*, for example, prison guards punched an inmate in the mouth, eyes, chest, and stomach while another officer held the inmate in place and kicked and punched him from behind. *McMillian*, 503 U.S. at 4, 112 S.Ct. at 997–98. The prisoner suffered swelling of the face, mouth, and lip, and the blows loosened his teeth and cracked his dental plate. *Id.* This egregious conduct was sufficient to state an Eighth Amendment claim. *See also McCord v. Maggio*, 927 F.2d 844, 848 (5th Cir.1991) (Eighth Amendment violation when a prisoner was forced to live and sleep for two years in an unlit cell with backed up sewage and roaches); *Fruit v. Norris*, 905 F.2d 1147, 1150 (8th Cir.1990) (Eighth Amendment violation when prison officials compelled inmates to work inside the prison's sewage lift-pump station without protective clothing and equipment); *Parrish v. Johnson*, 800 F.2d 600, 605 (6th Cir.1986) (Eighth Amendment violation when prison guard assaulted paraplegic inmate with a knife and forced him to sit in his own feces); *Vaughan v. Ricketts*, 859 F.2d 736, 741 (9th Cir.1988) (prison officials not entitled to qualified immunity regarding inmate's Eighth Amendment claim where untrained medical assistants performed digital rectal cavity searches on unsanitary table in view of other prison personnel); *Cooper v. Sheriff of Lubbock County*, 929 F.2d 1078, 1083 (5th Cir.1991) (forfeiture of adequate food for significant periods of time is a "form of corporal punishment" forbidden by the Eighth Amendment); *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir.1985) (concluding kitchen and food storage areas unsanitary and unconstitutional); *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir.1985) (inadequate "ventilation and airflow" violates Eighth Amendment if it "undermines the health of inmates and the sanitation of the penitentiary"); *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir.1979) (Eighth Amendment is violated where prison officials completely deny exercise to some prisoners and limit the remaining population to less than five hours indoor exercise per week). "Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *McMillian*, 503 U.S. at 9, 112 S.Ct. at 1000 (internal quotations and citations omitted).

We emphasize that this case does not present the same Eighth Amendment concerns found in *Jordan*, the case on which the district court relied in concluding that Somers alleged clearly established Eighth Amendment rights. In *Jordan*, we upheld a district court's injunction preventing male prison guards from conducting random, non-emergency, suspicionless, clothed body searches on female prisoners. 986 F.2d at 1522. During the searches, the male guards would "[p]ush inward and upward when searching the crotch and upper thighs of the inmate," in addition to "squeez[ing] and knead[ing]" the crotch and leg areas. *Id.* at 1523. Further, the male guards would then "search the breast area in a sweeping motion, so that the breasts [were] 'flattened.'" *Id.* We "conclude[d] that the Eighth Amendment prohibition against the unnecessary and wanton infliction of pain forbids these searches under the circumstances of [that] case." *Id.* at 1524.

Further, we discussed the "psychological differences between men and women," and noted that these differences "may well cause women and especially physically and sexually abused women, to react differently to searches of this type than would male inmates subjected to similar searches by women." *Id.* at 1525. We elaborated on the differences between men and women, noting:

> For example, in *Grummett v. Rushen*, 779 F.2d 491 (9th Cir.1985), this court considered the constitutionality of pat searches performed by female guards on male prisoners. We concluded that the inmates had not shown sufficient evidence of pain to make out a cognizable Eighth Amendment claim. *Id.* at 493 n. 1. Nothing in *Grummett* indicates that the men had particular vulnerabilities that would cause the cross-

**624**

gender clothed body searches to exacerbate symptoms of pre-existing mental conditions. Indeed, in contrast to this case, nothing in *Grummett* indicates that the male prisoners had experienced or would be likely to experience any psychological trauma as a result of the searches.

The record in this case supports the postulate that women experience unwanted intimate touching by men differently from men subject to comparable touching by women.

*Id.* at 1526.

*Jordan* is therefore relevant to the outcome of the instant case because it emphasizes: 1) the preexisting mental conditions of the female inmates, which were exacerbated by the searches; and 2) the intrusive and physical nature of the pat down searches that involved "kneading" the breasts and groin area of the female inmates. Neither of these factors are present in the instant case. Somers is a male inmate, and the searches and shower viewing did not involve any physical contact. To hold that gawking, pointing, and joking violates the prohibition against cruel and unusual punishment would trivialize the objective component of the Eighth Amendment test and render it absurd. The Officials, therefore, did not violate Eighth Amendment rights clearly established in *Jordan*.

In light of the above, we reverse the order of the district court and remand with instructions to grant the Officials qualified immunity on Somers's Eighth Amendment claim.

### CONCLUSION

Because we hold that the Officials did not violate Somers's clearly established Fourth or Eighth Amendment rights, we reverse the order of the district court and remand for proceedings consistent with this opinion.

**REVERSED AND REMANDED.**